IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ROYAL CARIBBEAN CRUISES LTD, et al.

  Plaintiffs,

v.

ALINA & A TOURS, INC.

  Defendant.

ALINA & A TOURS, INC.

  Counter-Claimant,

v.

ROYAL CARIBBEAN CRUISES LTD, et al.

  Counter-Defendants.

**Civil No. 10-1262 (SEC)**

**OPINION & ORDER**

Before the Court are plaintiffs' arbitration demand (Dockets # 61 and 133), and defendants' opposition thereto (Dockets # 64 and 134). With the benefit of the evidence introduced during a two-day hearing, and in accordance with the applicable law, the Court **DENIES** plaintiffs' arbitration demand.

**Background**

The present diversity complaint moves the Court to compel arbitration between the above-captioned parties or to declare that Puerto Rico's Laws 21 and 75[1] are inapplicable to their business relationship. Docket # 1. Plaintiffs, Royal Caribbean Cruises Ltd. and its wholly

---

[1] P.R. Laws Ann. tit. 10, §§ 278 and 279, respectively.

**Civil No. 10-1262 (SEC)**                                                                                          2

owned subsidiary Celebrity Cruises, Inc. (collectively, "Royal Caribbean") claim that a contract signed in 1995 with defendant, Alina & A Tours, Inc. ("A & A"), is in full force and effect today, due to yearly verbal extensions. Id. at ¶ 7.[2] That contract required the parties to arbitrate "[a]ny dispute or difference which may arise between [them] with respect to this [a]greement and which is not amicably settled . . . ." Id. at Exh. ¶ 21. A & A, however, opposes arbitration, arguing that the 1995 contract expired on its own terms in December 1995. Docket # 64, p. 5. Moreover, A & A alleges that its current relationship with Royal Caribbean is governed by verbal agreements with no arbitration requirement. Id.

The parties were involved in a similar dispute in 2006, when Royal Caribbean removed to this District a breach of contract suit A & A had filed in state court. See Civ. Case No. 06-1009 (JAG), Docket # 1. Then, even though A & A opposed arbitration, it accepted the validity and enforceability of the 1995 contract. Id. at Exh. B, ¶ 4.[3] In fact, A & A's 2006 complaint stated that "[a]fter 1995, the parties have not signed any additional contract, but . . . the contract in question has been extended and prolonged until the present time." Id. The same remarks were made in A & A's Opposition to Defendants' Motion to Dismiss in Order to Compel Arbitration of Contractual Disputes. Id. at Docket # 13, p. 1.

The prior case ended in March 2006, with the court dismissing A & A's complaint without prejudice and referring the case to arbitration pursuant to the 1995 contract. Id. at Dockets # 32 and 33. The court's decision was based on a magistrate judge's report and recommendation, which, among other things, established that the parties were bound (because of verbal annual extensions) by the terms of the 1995 contract. Id. at Docket # 17, p. 4.

---

[2] There is no controversy that the contract bound both Royal Caribbean Cruises Ltd. and Celebrity Cruises, Inc.

[3] A & A challenged instead the validity and enforceability of the arbitration clause. Id. at Docket # 13, pgs. 3-10.

**Civil No. 10-1262 (SEC)** 3

Based on the foregoing facts, in the present action, this Court held that A & A was judicially estopped from claiming that the 1995 contract had expired in December 1995. Docket # 76. The Court also credited the 2006 judicial determination that the parties had verbally renewed the 1995 contract annually up until that year. Id. Nevertheless, because the record available then was insufficient to determine whether the parties continued to verbally extend the 1995 contract after 2006, the Court scheduled an evidentiary hearing to allow the parties an opportunity to present evidence on the issue. Id.

After several continuances, the evidentiary hearing began on October 11, 2011 and ended the next day. Royal Caribbean called two witnesses: Ramma Rebapraggada ("Ramma"), Royal Caribbean's Sales and Marketing Director; and Magnus Wrahme ("Magnus"), Royal Caribbean's Associate Vice President. A & A, on the other hand, called three witnesses: Alina Castellanos ("Alina"), A & A's President and sole shareholder; Alberto Castellanos ("Alberto"), A & A's Vice President; and Doris Martinez ("Doris"), A & A's Marketing Director.

**Findings of Fact**

The parties' business relationship dates back to 1988, when, pursuant to a verbal agreement, A & A began to promote, market, and support the sale of cabin units of Royal Caribbean's cruise ships. Hearing Tr. 159:19 - 160:11, Oct. 11, 2011. At the time, Carnival Cruises dominated the cruise industry in Puerto Rico, with Royal Caribbean enjoying a minimal share of the island's market. Id. 160:13-20. In any event, due to the success obtained through their business dealings, Royal Caribbean and A & A executed a written agreement in March 1995. Id. 161:24 - 162:1.

Aside from the arbitration clause delineated above, the 1995 contract provided A & A with the "non-exclusive right to promote and sell through Travel Agents in the Caribbean . . . cruise vacations on vessels operated by [Royal Caribbean] . . . ." Joint Hearing Exh. 1, § 1. Moreover, the 1995 contract was effective "as of January 1, 1995 and shall continue until

**Civil No. 10-1262 (SEC)** 4

December 31, 1995 . . . ." Id. § 5. And once entered into, the 1995 contract could "not be waived, altered, modified, amended or supplemented in any manner except by a written document duly executed by both [Royal Caribbean and A & A]." Id. § 25. Despite this latter clause, once 1995 had run its course, Royal Caribbean and A & A verbally extended the 1995 contract for another year. Docket # 76, p. 2. The same happened every year thereafter until 2006. Id.

At the hearing, the parties presented conflicting evidence about the events that followed once 2006 had ended. Royal Caribbean's witnesses testified on direct examination that the relationship with A & A continued to be based on the 1995 contract. For example, Ramma, the first of the two Royal Caribbean executives to take the stand, testified that the terms and conditions of the relationship between Royal Caribbean and A & A were the same today than those in place back in 2006. Tr. 18:4-20, Oct. 11. Magnus, Royal Caribbean's second witness, corroborated Ramma's testimony, stating that the parties' relationship after 2006 remained unaltered. Id. 133:5-19.

In contrast, A & A's witnesses testified that the parties had premised their relationship after 2006, not on the 1995 contract, but on their course of conduct. In this regard, Alina stated that after 2006 Royal Caribbean never asked her to extend the 1995 contract through either a verbal or written agreement. Tr. 175:24-176:6, 177:7-10, 181:10-16, 189:6-15, Oct. 11. The following excerpt from Alina's direct examination reflects her position on this issue:

> Q. I'd like to ask you, after 2006, who, if anyone at Royal Caribbean, told you that the 1995 agreement was still the basis of the relationship?
>
> A. No one.
>
> Q. Well, why do you think they never mentioned it to you?

**Civil No. 10-1262 (SEC)**                                                                 5

    A.    Because it had expired. It was so different of what the reality going on. All terms and conditions had changed.

Tr. 181:10-16, Oct. 11. A & A's other witnesses presented similar testimony on this issue. See Tr. 47:5-16, 66:5-9, Oct. 12, 2011.[4]

    Furthermore, Alina also stated that after 2006, Royal Caribbean recognized that no written contract governed the parties' relationship and pressed her to sign a contract. Tr. 162:23-163:7; 166:7-10, Oct. 11. An email Royal Caribbean sent to Alina early in 2007 supports her testimony. A & A's Hearing Exh. K. In pertinent part, the email provided: "As per our conversation, you have been advised that, since a signed contract is not in place, you will not be able to attend this year's [event] in [the Dominican Republic] next week." Id. Moreover, Alina explained that she refused to sign several contracts Royal Caribbean sent her way after 2006, because all of them contained an arbitration clause, and A & A's attorney had advised her against agreeing to arbitration. Tr. 165-22 - 166:5, Oct. 11.[5]

    The testimony of Royal Caribbean's executives during cross-examination lends credence to A & A's versions of the facts. For instance, to the question whether after 2006 Ramma had had any conversations with A & A regarding the renewal of the 1995 contract, he retorted: "No, I'm not an Officer of the company, so you know. . . I don't have any authority in signing agreements." Tr. 43:14-24, Oct. 11. Similarly, when asked whether he was aware of any verbal agreement whereby the parties extended the 1995 contract after 2006, Ramma stated: "After [2006], my position changed. I was now relocated to Asia to open our offices in Singapore and China, so I was not involved in managing any affairs after [2006]." Id. 45:17-23; see also Tr. 46:6 - 47:1.

---

    [4] On cross-examination, Royal Caribbean ignored these testimonies.

    [5] Royal Caribbean's cross-examination also failed to cover this issue.

**Civil No. 10-1262 (SEC)** 6

The following testimony from Ramma's cross-examination further illustrates his understanding about the current validity and enforceability of the 1995 contract:

Q: Okay, so would it be fair to say that you're unaware of any verbal extension of the 1995 agreement beyond 2006?

A: Yes, I mean the 1995 agreement was in place, and that was the agreement under which we were operating from. . . you know. . . 2006.

Q. But, you're not aware of any verbal agreement to extend it. Is that correct?

A. Yes, that's correct.

Q. And, you're not aware of any written agreement to extend it?

A. That is correct, yeah.

Id. 47:2-12.

****

Q. Where did. . . where and how, if you know, did A & A Tours and [Royal Caribbean] had agreed to work under the terms and conditions of the 1995 agreement?

A. There was a Court ruling, in 2006, that pretty much the Court agreed that we were operating under the 1995 agreement.

Q. As of that date? Is that correct?

A. At least when I was responsible for the territory.

Q. Well, since you were responsible for the territory, did you ever have a discussion with anybody senior or junior to you about getting an agreement signed with A & A, a new agreement?

**Civil No. 10-1262 (SEC)**  7

> A. We. . . you know. . . discuss I.R. agreements with senior management, and. . . you know. . . that includes all I.R.'s.[6]
>
> Q. And, were there discussions about A & A in those meetings?
>
> A. There were discussions about A & A in those meetings, and [it] was pretty much understood that we were operating under the basis of the 1995 agreement.

Id. 50:9-25.[7]

Magnus' testimony was also telling. First, as Ramma, Magnus testified that his involvement with Puerto Rico covered a short fraction of the time relevant here: "From around the summer of 2008. . . I can't remember the exact date. . . Around July of 2008 up until I believe September of 2009." Tr. 124:23 - 125:5, Oct. 11. Second, also as Ramma, during cross-examination, Magnus conceded having little authority over the transactional aspects of the contractual relationship with A & A. Specifically, when asked whether he had studied the agreement to see how it could be changed, Magnus responded: "I looked at the agreement because it was the base of the existing relationship, but, in my analysis, I was more looking into how is the market managed, how are we servicing it, how do we. . . you know. . . *more in terms of a commercial context*. Tr. 137:9-15, Oct. 11. (emphasis added). Third, during his cross-examination, Magnus acknowledged that no written contract governed the parties' relationship, because Alina had refused to sign all the contracts Royal Caribbean had sent to her after December 1995. Id. 142:20 - 143:1. Indeed, in all of Magnus' interactions with A & A, he

---

[6] I.R. is the abbreviation Royal Caribbean uses for the term "International Representative Agreement." The 1995 contract was an I.R.

[7] On Ramma's re-direct, Royal Caribbean asked no questions about the answers highlighted here.

**Civil No. 10-1262 (SEC)** 8

described the parties' relationship as "the existing relationship" and never referred to the 1995 contract or its arbitration clause. Id. 146:16-22.[8]

To sum up, considering all the evidence introduced at the hearing, the Court credits the testimony of A & A's witnesses that today the parties operate under a verbal agreement that differs in some respects from the terms of the 1995 contract. The application of the law to this conclusion follows.

### Applicable Law and Analysis

A federal court sitting in a diversity case must apply the substantive law of the forum where the action is filed. Semtek Int'l. Inc. v. Lockheed Martin Corp., 531 U.S. 497, 498 (2001). In Puerto Rico, the Civil Code sets forth the general precepts governing contractual relationship. Among other things, the Code affords contracting parties great flexibility to delineate the scope of any agreement: "contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order. P.R. Laws Ann. tit. 31, § 3372. Similarly, it establishes minimal constraints in terms of form:  contracts are valid "whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist." Id. § 3451. Those conditions are "(1) [t]he consent of the contracting parties[;] (2) [a] definite object which may be the subject of the contract[;] [and] (3) [t]he cause for the obligation which may be established." Id. § 3391.

To evince the consent element, the party asserting that a contract exists must show "the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." Id. § 3451. Such acceptance can be either expressly or impliedly conveyed. Colon-Gutierrez v. Registrador, 14 P.R. Offic. Trans. 1095 (1983). "[C]onsent is considered implied when it is the result of facts and not words. The facts should unequivocally show the will to

---

[8] Royal Caribbean chose not to question Magnus on re-direct.

consent. They cannot be compatible with another intent, or be subject to many different interpretations." Teacher Annuity v. Soc. de Gananciales, 15 P.R. Offic. Trans. 372 (1984). Moreover, "in order to be understood that consent has been given to a legal transaction, whether express or implied, it is necessary that the declarant has adequate knowledge of the scope of his statement." Colon Gutierrez, 14 P.R. Offic. Trans. 1095.

The foregoing legal principles suffice to dispose of the controversy before the Court. The evidence of record shows that the parties' business relationship is premised on a verbal agreement, which resembles some of the basic terms included in the 1995 contract. For example, under the 1995 contract, A & A was paid a 25% percent commission for certain transactions and 23%, for others. Tr. 16:13 - 17:20, Oct. 11. Today that remains to be the case. Id. Royal Caribbean, however, provided no evidence to show that, after 2006, A & A consented to abide by anything else than basic terms of this sort.

For starters, as previously explained, Royal Caribbean brought forth witnesses, who, by their own admission, lacked knowledge about important aspects of the contractual relationship with A & A. Ramma, for example, admitted having been relocated to a position in Asia, totally unrelated to the Puerto Rico market, after 2006.  Similarly, Magnus, candidly stated that he was involved with the Puerto Rico market for only a limited time frame, over two years ago.

Furthermore, neither of Royal Caribbean's two witnesses stated how or when after 2006 A & A consented to be bound by all the terms of the 1995 contract. In fact, when pressed on this issue, Ramma's best answer was that such was the understanding within Royal Caribbean and that the court back in 2006 had confirmed that position.  As to Magnus, the farthest he ventured on this issue was to testify that the parties' relationship had been premised on the 1995 contract—how or when A & A consented to such an arrangement figured nowhere on his answers.

**Civil No. 10-1262 (SEC)** **10**

Royal Carribean rests its case on the proposition that "[t]here was no testimony provided that A & A Tours took any action to terminate the 1995[contract] that this Court found to be in effect as of the end of the 2006 Proceedings." Royal Carribean's Post Hearing Memorandum, Docket # 133, p 13. This contention is flawed for at least two reasons. First, the 1995 contract had a definite term: it expired on December 31 of each effective year. Accordingly, for the contract to be valid and enforceable today, the parties needed to either extend it verbally every December since 2006, or amend its expiration term. The record contains no evidence to conclude that any of these actions was ever taken. To the contrary, A & A introduced credible and undisputed evidence showing that no verbal or written agreement about extending the 1995 contract was ever reached, or even proposed, after 2006.

Second, before considering whether A & A took any actions to terminate the 1995 contract, Royal Caribbean needed to show that A & A had consented to operate under the 1995 contract beyond 2006. Royal Caribbean, however, failed to put forth witnesses that could attest as to this issue. More significant yet, Royal Caribbean made no attempts to refute the credible testimony of A & A's witnesses about the parties' business relationship being premised on their course of conduct, rather than on the 1995 contract.

One last point merits brief discussion. At the center of the current impasse between the parties lies an arbitration clause. It is no secret that this forum favors arbitration for public policy reasons. See e.g., McCarthy v. Azure, 22 F.3d 351, 354-55 (1994). Arbitration, however, "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Id; see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989) ("[The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."); Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 25 (1st Cir. 2000) (stating that arbitration agreements are "as enforceable as other contracts, but no more so."). In

**Civil No. 10-1262 (SEC)** 11

other words, "[t]hough a person may, by contract, waive his or her right to [judicial] adjudication, there can be no waiver in the absence of an agreement signifying an assent." <u>McCarthy</u>, 22 F.3d at 355. In light of these well-settled principles, the Court is puzzled with Royal Caribbean's failure to address Alina's refusal to bind A & A to a contract with an arbitration clause.

**Conclusion**

Because Royal Caribbean failed to show that A & A consented to extend the 1995 contract, or its arbitration clause, after 2006, the Court **DENIES** Royal Caribbean's arbitration request. A decision on other motions pending before the Court will be issued after considering the parties' respective briefs.[9] If appropriate, the Court will refer the case to mediation once it determines whether Puerto Rico's laws 21 and 75 apply to this case.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th of November, 2011.

s/ *Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge

---

[9] Currently before the Court are the following motions: (I) A & A's Motion for Declaratory Judgment and Injunctive Relief (Docket # 30); (ii) Royal Caribbean's and Celebrity's Response in Opposition to Motion for Declaratory Judgment and Injunctive Relief (Docket # 40); (iii) Royal Caribbean's and Celebrity's Motion to Compel Arbitration or, in the Alternative, to Dismiss Verified Amended Counterclaim (Docket # 61); (iv) A & A's Response in Opposition to Motion to Compel Arbitration or, in the Alternative, to Dismiss Verified Amended Counterclaim (Docket # 64); (v) Royal Caribbean's and Celebrity's Reply (Docket # 69); and (vi) A & A's Sur-reply (Docket # 72).